**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ISABEL F. SANSANO, Individually and On Behalf Of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>THE BANK OF NEW YORK MELLON CORPORATION, THE BENEFITS ADMINISTRATION COMMITTEE, ROBERT PEREGO, LISA B. PETERS, JOHN A. PARK, THE BENEFITS INVESTMENT COMMITTEE, LEO P. GROHOWSKI, THE APPOINTING AND MONITORING COMMITTEE, and JOHN DOES 1-30,<br><br>                  Defendants. | **Civil Action No.**<br><br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT<br><br><br><br><br><br>*Electronically Filed* |

Plaintiff Isabel F. Sansano ("Plaintiff"), individually and on behalf of a class of similarly situated participants in and beneficiaries of The Bank of New York Mellon Corporation 401(k) Savings Plan (the "Plan"), alleges the following based upon the investigation of her counsel, and upon personal knowledge as to facts pertaining to Plaintiff and on information and belief as to all other facts:

## NATURE OF THE ACTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132, against the Plan's fiduciaries, who are and were responsible for the investment of the assets and the administration of the Plan between January 1, 2008 through and including the present (the "Class Period"). During the Class Period, the Plan's fiduciaries, including The Bank of New York Mellon Corporation ("BNY") and certain of its senior officers and directors, breached their fiduciary duties owed to the Plan's participants and beneficiaries (collectively, the "Participants"), causing the loss of millions of dollars of Participants' retirement savings.

2.      Plaintiff was a BNY employee and participant in the Plan during the Class Period. As a Plan participant, Plaintiff, like other members of the Class, was entitled to set aside a certain percentage of her annual base salary for investment in various investment options provided by the Plan.  Among the investment options in the Plan was the BNY Common Stock Fund (the "BNY Stock Fund") which invested primarily in BNY common stock.

3.      Throughout the Class Period, the Plan invested heavily in BNY common stock. Because the Plan's holdings in BNY common stock comprised a significant percentage of the overall value of the Plan's investments held on behalf of the Participants, the long-term retirement savings of Participants were dependent, to a substantial degree, on the performance of BNY common stock.  So too were Participants' retirement fortunes dependent on the related need for prudent fiduciary decisions by Defendants, concerning such a large, ongoing investment of the Plan's assets.

4.     BNY is a financial services company that provides various investment management products and services worldwide to assist corporations, financial institutions, and individuals in managing and servicing their financial assets.

5.     BNY provides institutional investor clients with foreign exchange ("FX") trading. One type of FX trading arrangement is called a "standing instruction" through which a client places an order to the BNY to execute FX transactions for securities denominated in foreign currencies.  BNY uses these standing instruction arrangements for handling a high volume of small transactions or difficult to execute transaction in restricted and emerging markets currencies.  A benefit to using BNY's standing instruction service was the convenience of BNY executing FX trades itself, thereby saving the investor from having to deal with a currency exchange dealer directly.  However, under these standing instruction agreements, the investor does not negotiate or choose the exchange rate used by BNY.  Instead, BNY executes FX transactions on the investor's behalf automatically at a price and rate chosen by BNY. According to BNY's Form 10-Ks filed with the SEC throughout the Class Period, BNY described its fee revenue derived from FX trading as being a "primary type of fee revenue" for BNY's Asset Servicing business segment.

6.     Throughout the Class Period, BNY made a series of false and misleading statements and omissions regarding the exchange rates BNY used in connection with its standing instruction trades.  Specifically, although BNY represented that its FX trading service was offered free of charge or only for the cost of the transaction itself, BNY had been engaging in a secret price-fixing scheme through which it realized very large profits by misrepresenting or failing to disclose to clients about the actual exchange rate it had obtained. In fact, BNY would

intentionally set the price used on FX trades at the lowest and least favorable exchange rates so that BNY could profit from the pricing difference.

7.      Beginning in February 2011, the market learned the truth about BNY's practice of overcharging its clients in connection with the exchange rates BNY used in standing instruction FX transactions.  By October 2011, the attorneys general of Virginia, Florida, and New York as well as the United States Justice Department and Massachusetts securities regulators had filed separate civil actions against BNY alleging that BNY defrauded its clients by engaging in a practice of overcharging clients in FX transactions by giving them unfavorable currency-exchange rates over the last decade.

8.      As details publicly emerged about BNY's improper and unlawful trading practices, BNY's stock price plummeted, declining approximately 62% from a Class Period trading high of $49.40 per share on January 3, 2008 to a closing price of $18.97 per share on October 14, 2011, a price which is significantly less than the price at which the Plan and its participants were acquiring the stock during the Class Period.

9.      Defendants knew or should have known that during the Class Period, BNY had made material misrepresentations and omissions regarding BNY's systematic practice of overcharging investors for processing standing instruction FX trades by intentionally giving investors the least favorable exchange rates available, which caused BNY common stock to trade at artificially inflated levels.

10.      Plaintiff's claims arise from the failure of defendants, who are fiduciaries of the Plan, to act solely in the interest of the Participants, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4

11.     Defendants breached their fiduciary duties owed to the Plan and the Participants under ERISA by, among other things:

(a)     Selecting and maintaining the BNY Stock Fund as an investment alternative under the Plan and permitting the Plan to buy and hold shares of BNY common stock during the Class Period when the same represented an imprudent investment;

(b)     Encouraging BNY's employees to invest in the BNY Stock Fund;

(c)     Investing company matching contributions in the BNY Stock Fund during the Class Period and failing to divest the Plan from shares of BNY stock when continuing to do so became imprudent as a result of BNY's false and misleading statements and omissions regarding its practice of overcharging its clients for processing standing instructions pursuant to FX transactions;

(d)     Abdicating their continuing duty to review, evaluate, and monitor the prudence of the Plan's investment in the BNY Stock Fund; and

(e)     Failing to provide accurate, material information to Participants about BNY's practice of overcharging its clients for processing standing instruction FX transactions necessary to enable Participants to make informed investment decisions concerning their contributions invested in the BNY Stock Fund.

12.     As a result of defendants' breaches of their fiduciary duties, Plaintiff and members of the Class have suffered substantial losses of retirement savings and anticipated retirement income from the Plan.  As such, under ERISA, defendants are obligated to restore to the Plan the losses that resulted from their breaches of their fiduciary duties pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

13.     In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

14.     Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

15.     This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States."  28 U.S.C. § 1331.

16.     ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Pennsylvania.

17.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches

for which relief is sought occurred in this District, and/or some of the defendants reside or maintain their primary place of business in this District.

**THE PLAN**

18.     The Plan[1] is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

19.     The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34), in that separate individual Plan accounts are maintained for each participant based upon the amount contributed to each participant's account.

20.     Employees are eligible to participate in the Plan if they are a salaried U.S. employee of BNY or a subsidiary of BNY which has elected to have its U.S. employees covered by the Plan.  Employees are eligible in the Plan after completing 1,000 hours of employment with BNY within a year.

21.     According to the Plan's Summary Plan Description ("SPD") dated April 2011, BNY "believes that saving for retirement is a shared responsibility.  This means providing a plan that encourages you to save, while helping you reach your retirement goals with Company contributions."

22.     According to the April 2011 SPD, participants can contribute between 1% and 75% of their semi-monthly base pay.  For 2010, BNY matched 100% of the first 6% of each Participant's salary reduction and/or after tax contributions.  Prior to April 1, 2009, BNY's matching contributions were made in BNY common stock based upon the three-day average

---

[1]     On April 1, 2009, the Employee Savings & Investment Plan of The Bank of New York Company, Inc. merged with and into the Mellon 401(k) Retirement Savings Plan and the resulting plan was renamed "The Bank of New York Mellon Corporation 401(k) Savings Plan." On July 1, 2010, BNY acquired PNC Global Investment Servicing, Inc., resulting in the merger of the PNC Global Investment Servicing Inc. Retirement Savings Plan into The Bank of New York Mellon Corporation 401(k) Savings Plan.

close on the New York Stock Exchange.  Beginning April 1, 2009, BNY's matching contributions were made in cash.

23.     The Plan offers a variety of investment alternatives, including lifecycle funds, collective funds, mutual funds, and BNY common stock.  According to the Form 11-K filed by BNY with the Securities and Exchange Commission ("SEC") on June 24, 2011 (the "11-K"), as of the fiscal year ended December 31, 2010, approximately 12% of the Plan's assets were held in BNY common stock, worth a fair value of investment of $935,430,715.

24.     Under the Plan's policies stated in the April 2011 SPD, BNY places trading restrictions on Participants' investment in BNY common stock in the Plan.  The BNY "Personal Securities Trading Policy" contains a rule stating that a participant "may not buy and then sell (or sell and then buy) BNY Mellon common stock within a period of less than 60 days.  Making more than one purchase or more than one sale is permitted, but opposing transfers are a violation of the Policy."

25.     The Plan is a legal entity which can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, Plaintiff seeks relief on behalf of the Plan.

## PARTIES

26.     Plaintiff is a resident of the State of New Jersey and is and was at all relevant times a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Among other available options under the Plan, Plaintiff selected the BNY Stock Fund for her retirement account.

27.     Defendant BNY is a Delaware corporation with its headquarters located at One Wall Street, New York, NY 10286.[2]  BNY is a financial services company that provides various investment management products and services worldwide to assist institutions and individuals in managing and servicing their financial assets.  BNY operates within several different segments, including the Asset Management, Wealth Management, Asset Servicing, Clearing Services, and Treasury Services segments.  BNY's two primary business segments are Asset Management and Securities Servicing.  During the Class Period, BNY common stock traded on the New York Stock Exchange under the symbol "BK".

28.     During the Class Period, BNY was the sponsor of the Plan and exercised discretionary authority over the Plan, acting through its Board of Directors (the "Board"), its officers, the Plan's Benefits Administration Committee (the "Administration Committee") appointed to administer the Plan with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets, the Plan's Benefits Investment Committee (the "Investment Committee"), appointed to oversee the Plan and its investment-related matters, and the BNY Appointing & Monitoring Committee (the "Monitoring Committee"), responsible for appointing and monitoring the members of the Administration Committee and Investment Committee.

**Administration Committee**

29.     Defendant Administration Committee served as the administrator and "named fiduciary" of the Plan during the Class Period.  According to BNY's Form 5500 for the Plan filed with the Department of Labor and the Department of the Treasury for the fiscal year ending

---

[2]     On July 1, 2007, The Bank of New York Company, Inc. and Mellon Financial Corporation merged to form BNY.

December 31, 2009 (the "Form 5500"), the Administration Committee administers the Plan at BNY Mellon Center, 500 Grant Street, Room 3118, Pittsburgh, PA 15258-0001.

30.     According to the 11-K, the Administration Committee "has full discretionary power and authority to construe, interpret and administer the Plan, including questions concerning eligibility and payment of benefits and may adopt rules and regulations for administering the Plan."   According to the SPD, the Administration Committee "also has the authority to retain individuals to assist with the Plan's administration.  The [Administration] Committee's decisions are final and binding upon all parties, including [BNY], its employees, and the Plan's participants.   In addition, the Administration Committee "is responsible for investment-related matters, including the establishment of an investment policy, the appointment of investment managers, and the monitoring of the performance of the Plan's investment funds." Members of the Administration Committee were appointed by the Monitoring Committee and included officers and other employees of BNY who participated in managing and administering the Plan.

31.     Defendant Robert Perego ("Perego") served as a member of the Administration Committee during the Class Period.  Defendant Perego signed BNY's Form 5500 as the individual signing as the plan sponsor and plan administrator.

32.     Defendant Lisa B. Peters ("Peters") served as a member of the Administration Committee during the Class Period and signed the 11-K as an individual duly authorized by the Administration Committee to sign the 11-K on its behalf.

33.     Defendant John A. Park ("Park") served as a member of the Administration Committee during the Class Period and signed the 11-K as an individual duly authorized by the Administration Committee to sign the 11-K on its behalf.  In addition, Defendant Park signed

10

BNY's Form 10-Qs filed with the SEC during the Class Period as the Duly Authorized Officer and Principal Accounting Officer of BNY.

34.     Defendant John Does 1-10 consist of the remaining members of the Administration Committee.  Because Plaintiff is currently unaware of the true identities and capacities of the remaining members of the Administration Committee, those individuals are named as John Does 1-10.  The remaining members of the Administration Committee, whose real names will be substituted when they are known to Plaintiff, exercised discretionary authority and discretionary control with respect to the management of the Plan and their assets.

35.     Defendants Perego, Peters, Park, and John Does 1-10 are collectively referenced herein as the "Administration Committee Defendants."

**Investment Committee**

36.     Defendant Investment Committee is responsible for overseeing investment-related matters with the respect to the Plan, including the establishment of an investment policy, the appointment of investment managers, and the monitoring of the performance of the Plan's investment funds. Members of the Investment Committee were appointed by the Monitoring Committee and included officers and other employees of BNY who participated in managing and administering the Plan.

37.     Defendant Leo P. Grohowski ("Grohowski") served as a member of the Investment Committee during the Class Period.

38.     Defendant John Does 11-20 consist of the remaining members of the Investment Committee.  Because Plaintiff is currently unaware of the true identities and capacities of the remaining members of the Investment Committee, those individuals are named as John Does 11-20.  The remaining members of the Investment Committee, whose real names will be substituted

when they are known to Plaintiff, exercised discretionary authority and discretionary control with respect to the management of the Plan and their assets.

39.     Defendants Grohowski and John Does 11-20 are collectively referenced herein as the "Investment Committee Defendants."

**Monitoring Committee**

40.     Defendant Monitoring Committee is comprised of senior management of BNY and is responsible for selecting, monitoring, and removing members of the Administration Committee and Investment Committee.

41.     Defendant John Does 21-30 consist of the remaining members of the Monitoring Committee.  Because Plaintiff is currently unaware of the true identities and capacities of the remaining members of the Monitoring Committee, those individuals are named as John Does 21-30.  The remaining members of the Monitoring Committee, whose real names will be substituted when they are known to Plaintiff, exercised discretionary authority and discretionary control with respect to the management of the Plan and their assets.

42.     Defendants John Does 21-30 are collectively referenced herein as the "Monitoring Committee Defendants."

**DEFENDANTS WERE FIDUCIARIES OF THE PLAN**

43.     During the Class Period, all of the defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

44.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(A)(1), 29 U.S.C. § 1102(a)(1).  A person is a fiduciary if he is designated a "named fiduciary" under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Additionally, to the extent that a

12

person is delegated responsibilities under the plan or a procedure specified in the plan, he or she is a named fiduciary under ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

45.    A person can also be a *de facto* fiduciary as a result of his authority or control over the plan under the very broad definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29 U.S.C. § 1002(21)(A).  A person or entity is a fiduciary where, by his conduct, he or she engages in fiduciary activities.  Thus, those who have discretionary authority over administering or managing the plan or who exercise authority or control over the plan's assets are fiduciaries regardless of the labels or duties that the plan's language assigns to them.

46.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, BNY chose to internalize this fiduciary function.  The Plan is administered by the Administration Committee, which has discretionary authority to manage and control the operation and administration of the Plan and investment of its assets.

47.    During the Class Period, defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

**Fiduciary Status of BNY**

48.    During the Class Period, BNY was also a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, BNY through its officers, directors or otherwise, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and is therefore a fiduciary of the Plan.  BNY also exercised discretionary authority with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility.

13

49.     BNY was a fiduciary to the extent that the Board and/or its employees served on the Administration, Investment, and/or Monitoring Committees.  Upon information and belief, the Administration Committee Defendants, Investment Committee Defendants, and the Monitoring Committee Defendants were officers and other employees of BNY.  Based on these facts, BNY had control over the actions of the Administration, Investment, and Monitoring Committees and their members and is liable for the actions of those Committees.

50.     Throughout the Class Period, BNY had, at all applicable times, effective control over the activities of its directors, officers, and employees, including over their activities related to the Plan.  Through the Board or otherwise, BNY had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, BNY had the authority and discretion to appoint, monitor, and remove individual directors, officers, and employees from their individual fiduciary roles with respect to the Plan.  Accordingly, the actions of the Administration, Investment, and Monitoring Committees, and/or any other employee fiduciaries are imputed to BNY under the doctrine of *respondeat superior*, and BNY is liable for these actions.

51.     In addition, BNY acted as a fiduciary in connection with the dissemination of Plan communications to the Plan's Participants.  BNY made direct representations to Participants relating specifically to the Plan's investment options, the business and financial condition of BNY, and the merits of investing the Plan's assets in BNY common stock, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

52.     BNY was responsible for disseminating a SPD for the Plan to Participants.  BNY was also responsible for disseminating to Participants the Plan's prospectus ("Prospectus"),

which purports to describe the investment characteristics of the Plan's various investment options.   The Prospectus and all information contained or incorporated therein constitute representations disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plan's assets allocated to their accounts.

53.    BNY's filings with the SEC, including but not limited to, annual reports, press releases, Forms 10-K, and Registration Statements, were incorporated by reference into the Prospectus, and Participants were directed to review the Prospectus for BNY disclosures of important information concerning BNY.   BNY exercised discretion over the contents of the SPDs and the Prospectuses it disseminated, which were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

54.    Under ERISA, BNY was not required to offer BNY common stock as an investment option under the Plan or to incorporate all of BNY's SEC filings into the Plan's documents, but once it elected to do so, it rendered the disclosures contained in the SEC filings disclosures made in a fiduciary capacity.

**Fiduciary Status of the Administration Committee**

55.    As the Plan administrator, the Administration Committee is a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).   Members of the Administration Committee were also fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration and management of the Plan and/or the Plan's assets, and possessed the full authority in their absolute discretion to determine all questions of eligibility for an entitlement to benefits under the Plan.

56.     According to the 11-K, the Administration Committee is a "named fiduciary" of the Plan and "has full discretionary power and authority to construe, interpret and administer the Plan, including questions concerning eligibility and payment of benefits and may adopt rules and regulations for administering the Plan."

57.     The Administration Committee Defendants were fiduciaries of the Plan because they made statements to Plan Participants and they exercised discretionary authority with respect to: (i) managing and administering the Plan; and/or (ii) managing and disposing of the Plan's assets.

58.     Defendant Perego is also a fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(2l)(A), in that Defendant Perego signed BNY's Form 5500 as the individual signing as the Plan's sponsor and the Plan's administrator.

**Fiduciary Status of the Investment Committee**

59.      The Investment Committee is a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).   Members of the Investment Committee were also fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration and management of the Plan and/or the investment of the Plan's assets, and possessed the full authority in their absolute discretion to determine all investment-related questions with respect to the Plan.

60.     According to the 11-K and SPD, the Investment Committee is "the named fiduciary which is responsible for investment-related matters, including the establishment of an investment policy, the appointment of investment managers, and the monitoring of the performance of the Plan's investment funds."

61.    The Investment Committee Defendants were fiduciaries of the Plan because they exercised discretionary authority or control in selecting, evaluating, monitoring, and altering the makeup of the investment alternatives available under the Plan.   The Investment Committee Defendants also had the responsibility to provide complete and accurate information to Participants about the investment offerings in the Plan, either directly or by communicating that information to the Board.

**Fiduciary Status of the Monitoring Committee**

62.    The Monitoring Committee is a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).   Members of the Monitoring Committee were also fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration and management of the Plan and/or the investment of the Plan's assets, and possessed the full authority in their absolute discretion to determine all investment-related questions with respect to the Plan.

63.    According to the SPD, the Monitoring Committee is "the named fiduciary responsible for appointing, monitoring, and (if necessary) replacing the members of the Benefits Administration Committee and the benefits Investment Committee."   According to the SPD, the Monitoring Committee has the discretionary authority to remove members of the Administration Committee and the Investment Committee "at any time."

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

64.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions.   Section 3(21)(A)(i) of ERISA, 29 U.S.C. § 1002(21)(A)(i), provides that a person is a fiduciary "to the extent ... he exercises any discretionary authority or discretionary control

17

respecting management of such plan or exercises any authority or control respecting management of disposition of its assets ....”  During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

65.     Further, ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants, which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead or knowingly allow others to materially mislead, participants and beneficiaries.  Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan's participants will not be injured.

66.     During the Class Period, upon information and belief, Defendants made direct and indirect communications with Participants, which included statements regarding investments in the BNY Stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including SPDs and Prospectuses regarding the Plan's/Participants' holdings of BNY common stock), which incorporated and/or reiterated these statements.  These communications were acts of the Plan's administration and Defendants acted as fiduciaries to the extent that they engaged in this activity.

67.     Upon information and belief, Defendants communicated material information necessary for Participants to make informed decisions with respect to the investment of BNY stock in the Plan and, in an attempt to comply with ERISA § 404(a)(1)(A) and (B), defendants referenced and incorporated BNY SEC filings into documents intended to convey information related to the Plan to Participants.  Upon information and belief, BNY SEC filings were

incorporated into Form S-8 registration statements, SPDs, prospectuses, and/or other fiduciary communications.

**All of the Defendants Were Co-Fiduciaries**

68.     Each defendant is liable for the breaches of fiduciary duty of the other defendants under ERISA § 405, 29 U.S.C. § 1105.

### DEFENDANTS' FIDUCIARY DUTIES

69.     ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a).

**The Duty of Prudence**

70.     ERISA § 404(1)(a)(B) imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims …."

**The Duty of Loyalty**

71.     ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries."

72.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye-single" to the interests of the participants and beneficiaries, regardless of any other interests, including those of the fiduciaries themselves or the plan sponsor.

19

**The Duty to Disclose and Inform**

73.     The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.  These duties recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

74.     Pursuant to the duty to disclose and inform, at all relevant times, plan fiduciaries are required under ERISA to furnish certain information to plan participants.  For example, ERISA § 101, 29 U.S.C. § 1021, requires the plan's administrator to furnish an SPD to participants.  ERISA § 102, 29 U.S.C. § 1022, provides that the SPD and all information contained or incorporated in it constitutes representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the plan and in making decisions concerning their benefits and the investment and management of plan assets allocated to their accounts.

**The Duty to Monitor Appointed Fiduciaries**

75.     Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries who are appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.

**The Duty to Investigate and Monitor Investment Alternatives**

76.     The duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in the Plan, including employer stock, to ensure that each investment is a suitable option for the Plan.

20

**The Duty to Disregard Plan Documents When Necessary**

77.     A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action as a class action pursuant to Rule 23(a), (b)(1)(b), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plan at any time between January 1, 2008 through and including the present, and whose accounts held BNY common stock or units in the BNY Stock Fund.

79.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, but can be ascertained readily through appropriate discovery, upon information and belief there are at least thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.  According to BNY's Form 5500 for the fiscal year 2009, at the end of the year 2009, the Plan had 42,466 total participants, active, retired, or separated who were entitled to or currently receiving benefits under the Plan.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)     whether defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)     whether defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants;

(c)     whether defendants violated ERISA; and

(d)     whether Plaintiff and members of the Class have sustained damages and, if so, what is the appropriate measure thereof.

81.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of defendants' wrongful conduct in violation of ERISA as complained of herein.

82.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

83.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class or parties to the actions, or substantially impair or impede their ability to protect their interests.

84.     Class action status is also warranted under Rule 23(b)(2) because defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

85.     Class action status is additionally warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class predominate over any questions

affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

**SUBSTANTIVE ALLEGATIONS**

**FX Trading at BNY**

86.     Over the past decade, institutional investors, including many pension funds, have sought diversification through investments in companies and securities markets located internationally.  Pension funds in particular have found foreign securities useful in fulfilling their statutory diversification requirements.  This is well known to custodial service providers such as BNY.

87.     The FX trading market is the largest financial market in the world, trading at approximately $3 trillion each day.  FX trading takes place worldwide 24-hours a day, except on weekends.  During this time, FX trading is not conducted at one central location but is conducted between participants through electronic communication networks and phone networks in various markets throughout the world.

88.     Foreign investments are bought and sold in the foreign currency of the nation in which they are issued.  As a result, United States investors have no choice but to purchase and sell those same foreign currencies in order to transact in foreign securities.  To service this need, BNY provides foreign currency exchange services to facilitate their clients' participation in international securities markets.  For each currency bought and sold, there will necessarily be a high trade and a low trade based on the daily exchange rate used to execute the trade.

89.     BNY principally offers two types of FX services: (a) negotiated FX transactions; and (b) standing instruction FX transactions.  Under a negotiated FX arrangement, the custodial client or its investment manager negotiates directly with an FX trader at BNY to buy or sell the

currency at a particular price.   However, under a standing instruction FX agreement, the custodial client does not negotiate the exchange rate with BNY, but rather, BNY executes the transactions for the client automatically or on an as-needed basis at a time and price determined by BNY.   BNY's standing instructions clients have included a wide range of pension plans and federally insured financial institutions.

90.   BNY has used its standing instruction FX service to generate significant revenue. Upon information and belief, BNY's standing instruction FX trading has been far more profitable than its negotiated FX transaction business: although standing instructions trades have been only 20% of the Bank's FX volume, 65% to 70% of the Bank's FX trading revenue comes from standing instruction trades.   BNY has seen its sales margins for standing instructions foreign exchange trading total more than $1 billion since 2007.

91.   Throughout the past decade, BNY has promoted its standing instruction service as a simple, flexible, and complete service that automates the capture of all types of custody-related FX transactions, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings, and residual balances.   BNY has further expressly advertised its standing instruction service as simple, free-of-charge, and designed to help clients minimize risks and costs related to the foreign exchange.

92.   According to its company website, BNY provides its clients with "FX execution according to best execution standards."   Indeed, BNY consistently informed prospective clients that the exchange rate that they would be given will be "best execution," "the best rate of the day," and/or "most attractive/competitive rate available to the Bank."   "Best execution" standard is commonly interpreted as meaning that the client would receive the best available market price at the time of execution of the currency trade.

24

93.     Furthermore, BNY has represented that its standing instruction clients benefit from "aggregation and netting of trades based on guidelines tailored to clients needs." "Aggregation and netting" means that, when a client executes multiple transactions requiring both the sale and purchase of the same currency, the transactions are aggregated and netted so that, rather than engaging in multiple separate currency trades, the client will only buy or sell the net amount of currency needed for all of the transactions together.

94.     BNY also informed standing instruction clients that: the prices provided for currency transactions would fall within daily ranges for each particular currency that the bank would publish each morning at 9:30 a.m. Eastern Time, the rate would not depart from the relevant Interbank rate by more than three percent; and the rate would not be less favorable to the client than the corresponding rate indicated on the daily schedule for that day.

95.     However, these representations and assurances were false and misleading and created a glaring misconception about the exchange rates used by BNY in conducting its standing instruction FX services.  On the contrary, BNY did not use "best execution" standards. In reality, it was BNY's practice to give its standing instruction clients, if not the worst, nearly the worst possible price available during any given trading day.  BNY understood the commonly held meaning of "best execution" standards but misrepresented and failed to disclose that it was not providing this standard for its standing instruction clients.

96.     Furthermore, BNY's standing instruction FX service was not "free of charge," as BNY represented.  In fact, when a BNY standing instruction FX client purchased currency, the bank charged the client based on an exchange rate significantly higher than the actual rate at which BNY was required to pay in executing the purchase.  In contrast, when a standing instruction FX client sold a currency, the bank gave the client an exchange rate significantly

lower than the actual rate at the time of the currency transfer referred to that sale. Under both scenarios, BNY knowingly manipulated the purchase and sale exchange rates to give the client the worst price of the day.

97.     At the same time, BNY realized significant profits from manipulating the exchange rates and keeping for itself the difference between the worst price on the day it charged the client and the higher Interbank market price received by BNY at the time BNY actually executed the transaction. Specifically, BNY would look for the points in each trading day during which the exchange rate was at its highest and its lowest and would report to its clients that BNY had received a rate for the clients' FX sales at one of the lowest prices in that range. In reality, however, BNY would obtain an exchange rate on that sale on one of the highest prices in that range, and unbeknownst to clients, BNY would pocket the difference between those prices.

98.     To conceal this practice, BNY did not disclose that standing instruction clients always received nearly the worst possible rate within the range on the daily schedule. If clients were aware of this practice, they would not have given their standing instruction business to BNY. Upon completion of a standing instruction trade, the only pricing information provided to the client by BNY would be the final exchange rate obtained. No time stamp would be provided for the trade, thereby preventing clients from verifying whether they had received a fair rate.

**BNY's False And Misleading Statements and Omissions**

99.     Throughout the Class Period, BNY and its officers and directors repeatedly issued materially inaccurate statements and omissions that misrepresented and failed to disclose that BNY had engaged and was engaging in a systematic business practice of overcharging clients in standing instruction FX transactions. Although BNY represented that the foreign exchange rates it was using for its standing instruction services constituted the best and most competitive rates

26

available, BNY engaged in a secret price-fixing scheme through which it purposely gave clients the least favorable rates so that BNY could realize large profits on those trades. For example, if a client sought to purchase a certain currency, BNY would take the order, make a spot trade at the most preferential rate possible, tell the client that the bank had obtained a much worse rate on the exchange, and then pocket the spread.

100.    As a result of BNY's practices, BNY realized profits at the expense of investors while reporting increased FX trading revenue and growth in Asset Servicing throughout the Class Period. Consequently, BNY and its officers and directors misled the public and the Participants regarding the true nature of BNY's business practices and its overall financial health. As a further consequence, shares of BNY common stock traded at artificially inflated prices during the Class Period.

101.    In a press release appended to a Form 8-K filed by BNY with the SEC on October 18, 2007, BNY reported FX trading and "other trading" revenue of $238 million for third quarter 2007, up 74% year over year reflecting "higher client volumes, as well as a significant increase in currency volatility and a higher valuation of the credit derivatives portfolio."

102.    Also on October 18, 2007, BNY held a 2007 earnings conference call, during which certain officers and directors of BNY made the following statements:

Gerald I. Hassell, [President and director of BNY]:

> "I want to say how pleased we are about how we've come together as a new company, and our performance has been excellent. Our integration is on track, and at the same time we are posting strong growth in all of our businesses…. Securities servicing fees in the aggregate were up 31% year-over-year, **led by asset servicing**, depositary receipts and Corporate Trust. Plus, we had a strong deposit flow in net interest income from these businesses that Bruce will speak to in a minute.
>
> I know an area of great interest to you is **asset servicing**. There

have been a few skeptics out there who wondered whether we could go through an integration and simultaneously grow our business. *While the marketplace and our clients are responding very favorably to our new company's offering and the excellent service we are providing them*, we have won 41 of 82 publicly announced new business wins in January through June, equaling the total of all competitors combined.

* * *

Bruce W. Van Saun – [BNY's] Chief Financial Officer:

*FX and other trading showed excellent growth year-over-year and sequentially. FX volatility and volumes were way up given the market conditions, and we capitalized.* To a much smaller degree, we also benefited from a higher value of our credit derivatives portfolio."

(Emphasis added).

103.    On January 17, 2008, BNY filed a Form 8-K with the SEC reporting its financial results for the fourth quarter of 2007.  For the quarter, BNY reported FX trading and "other trading" revenue of $305 million, up 97% from the same period of 2006.  In the press release appended to that Form 8-K filed, BNY described the fourth quarter increase in FX trading revenue as reflecting, "higher client volumes, a significant increase in currency volatility, as well as a higher valuation of the credit derivatives portfolio."

104.    On January 17, 2008, BNY held a fourth quarter 2007 earnings conference call, during which certain officers and directors of BNY made the following statements:

Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:

… [CFO] Bruce [W. Van Saun] is going to provide greater details into the numbers as well as our excellent progress integrating our two legacy companies.  But first I'm going to ask Gerald to make some more specific comments about our revenue momentum *and some continued good news regarding the performance of our*

28

*asset servicing business*.  Gerald?

*** 

Gerald I. Hassell, [President and director of BNY]:

Thanks Bob.  We've now delivered two strong quarters across all of our businesses, a great start for our new company.  We're winning new business, we're retaining our client, pipelines are in excellent shape and *we're delivering on our commitment to service quality*.  We are experiencing momentum all around going into 2008. *For 2007, security servicing and asset management fees, our major sources of revenue, each enjoyed strong growth over the year ago quarter.*  Asset and wealth management fees were up 14% year over year and *security servicing fees were up 26% year over year led by asset servicing, which had an outstanding fourth quarter.  Total revenues in this sector were up 42% with fees up 37%, FX and trading income up 89% and net interest revenue up 46%.  These results compare quite favorably to our peer group and were powered not only by market volatility but also by increased client activity, deposit flows and of course excellent new business results.*

*** 

*In asset servicing we are particularly mindful of how we are performing given the integration that we're going through.  I'm very pleased to report that in a recently released global custodian survey our new combined company received nine operated awards in key categories and 130 best in class awards which is more than any other service provider.*

*We're off to a great start to achieve our goal of number one rankings in all the major industry surveys and we're going to continue to work hard on delivering great service to our clients.*

On the revenue synergy front, on our last call we shared our revenue synergy goals of $250 million to $400 million in incremental new revenue in 2011.  We are meeting our interim targets and synergies achieved to date have come from a few key activities.  Our proprietary mutual funds have now captured about 24% of client money market flows from our various businesses up from 15% at the end of '06.  *And our FX and securities lending [inaudible] have come together quite nicely adopting a number of best practices and achieving good synergies.*  And of course we're affectively cross selling our expanded asset management capabilities to our asset servicing clients.

29

Bruce Van Saun:

> *FX and other trading had a stellar quarter up 97% year over year and 28% sequentially reflecting market volatility and volumes as well as an increase in value in our credit derivatives portfolio given credit spread widening.*
>
> I'm going to conclude my remarks by offering a few observations about the coming year. We are confident of momentum and positioning of our franchise as we enter '08. *In terms of how to think about us going forward, our servicing businesses are over earning their trend line today given market volumes and volatility particularly in securities lending, FX and net interest income.* A key question for 2008 is how long will these favorable conditions last. That's a tough one but what I can tell you is that the variable that we can control such as service quality and net new business continue to be in great shape."

***

James Palermo, [BNY officer and member of BNY's Executive Committee]:

> Brian what we've seen is we're able to accomplish in the latter half of '07 was actually consolidating both the [inaudible] so I think we've realized the synergy components of that and now we're actually through the balance of '08 and I think it'll be in the September, October time frame, we're working on the applications being integrated as well. So we'll get a little bit of a positive impact at that point. *But in terms of the best practices from a trading and lending perspective, those are already pretty much in the run rate.*

(Emphasis added).

105.    On February 28, 2008, BNY filed its Form 10-K with the SEC for the fiscal year

2007, reporting asset servicing revenue of $2.350 billion and stating:

> *Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, was $786 million in 2007, an increase of $371 million, or 89%, compared with 2006.* The increase was due to the merger with Mellon, record customer volumes due to increased activity of the existing client base, new clients, and the favorable impact that resulted from increased currency volatility in the second half of 2007. Other trading activities increased reflecting a higher valuation of

30

the credit derivative portfolio caused by the widening of credit
spreads.

(Emphasis added).

106.    In a press release containing the byline, "Strong growth in Asset Servicing –
Significant operating leverage – Integration continues on track" appended to the Form 8-K filed
with the SEC on April 18, 2008, BNY reported FX trading and "other trading" revenue of $259
million for the first quarter of 2008.  In highlighting the fact that this number was 42% year over
year increase, BNY announced that:

> "***Our businesses are performing well in a tough environment***.
> We generated 14% revenue growth compared to the first quarter of
> 2007, significant positive operating leverage and 16% EPS growth.
> Market volumes and volatility, together with new business wins,
> ***continued to favor our asset servicing*** and clearing businesses,
> while lower market values impacted our asset management
> business.  Our progress on the merger and integration continues to
> be excellent," said Robert P. Kelly, chief executive officer of The
> Bank of New York Mellon.

(Emphasis added).

107.    That same day, BNY held a first quarter 2008 earnings conference call, during
which certain officers and directors of BNY made the following statements:

Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the
Board from the 2007 Merger to August 31, 2011]:

> You should assume that we will continue to sharpen our focus in
> the coming quarters. ***One of the fundamental commitments we've***
> ***made to our clients is industry leading client service around the***
> ***world in all of our businesses.  I'm delighted to advise that***
> ***there's further evidence we're succeeding on that front and most***
> ***notably in asset servicing.***
>
> Last quarter we told you about our number one performance in the
> global custodian survey. ***This quarter the results of the R&M***
> ***global survey were released and we were again ranked number***
> ***one amongst the world's largest global custodians. So we're***
> ***consistently achieving our goal of outperforming our peers.  Our***

31

*success on the quality front is also paying off.  In asset servicing during the quarter we won approximately $350 billion in new assets.  This represents 60% success rates on the deals we bid on. In asset servicing our pipeline remains strong, up over the prior quarter and this time last year and we again exceeded client retention goals with a rate now well in excess of 99%.*

\*\*\*

Ken Usdin – Bank of America Securities:

> Well and just can you give us anecdotes or are there tangible revenue synergies in this quarter?

Gerald I. Hassell, [President and director of BNY}:

> *They're very similar to the ones we've seen in the past and that is greater use and greater trading capabilities in our sec lending and foreign exchange areas*.  Money market flows out of areas like Pershing and our corporate trust areas into Dreyfus, cross selling of asset management into our asset servicing clients.  Those are the three main areas that continue to perform quite well.

\*\*\*

Bruce Van Saun:

> Yeah I think Tom given the uncertainty out there, that's a little hard one to call.  *You know what I think we're trying to describe the framework is that you know asset servicing has really been off the charts and the comps will get tougher for asset servicing as we go through the year*.

(Emphasis added).

108.   On June 17, 2008, BNY hosted its 2008 Investor Conference, during which Defendant B. Kelly provided a presentation with a slide entitled "Stengths: Our Values and Behaviors", which highlighted BNY's pitch to investors that a fundamental part of BNY's strategy was to present a trustworthy brand of impeccable integrity.  That presentation slide pledged, among other things, that "[BNY] will be proactive and treat our clients as partners," that "[BNY] will put ourselves in the client's shoes," that BNY would act "with the highest standards

32

of integrity and openness to ensure the trust of those we serve," that "[BNY] will be open and

honest", that "[BNY] will operate with integrity," that "[BNY] will conduct business with the

highest ethical standards," that "[BNY] will be mindful of our actions," and that "[BNY] will be

responsible members of our communities."

109.    On July 17, 2008, BNY filed a Form 8-K with the SEC reporting financial results

for the second quarter of 2008.  For that quarterly period, BNY reported asset servicing revenues

of $868 million, up 25% year over year, driven in part by FX trading and "other trading" revenue

of $308 million.  On BNY's balance sheet for the quarter, BNY reported a 75% year over year

increase in FX trading and "other trading" revenue.

110.    Also on July 17, 2008, BNY conducted a second quarter 2008 earnings

conference call, during which certain BNY officers and directors made the following statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the
> Board from the 2007 Merger to August 31, 2011]
>
>> We are winning a lot of new business. Net asset flows were plus
>> $13 billion during the quarter.  ***New Asset Servicing wins were
>> $600 billion***. Private wealth client assets wins were $2 billion. We
>> saw good momentum in DRs, non-US corporate trust, clearing and
>> treasury services.  ***We are delivering great service.  We won
>> recognition for service quality in Asset Servicing, corporate trust,
>> collateral management and transition management.***
>
> Todd Gibbons:
>
>> Now, my comments going forward will focus on our core business
>> excluding the SILO charge.  ***Our three largest businesses, Asset
>> Management, Asset Servicing and Issuer Services continued to
>> capitalize on the faster growing global markets, as each
>> generated in excess of 40% of their revenues outside of the US***.
>> Non-US revenue for the company increased to 35% from 30% in
>> the second quarter of '07 and 33% in Q1. We kept expense growth
>> to 2% resulting in 500 basis points of positive operating leverage.
>> If you exclude the securities losses we had year-over-year positive
>> operating leverage of a 1,000 basis points.

***

> …***Traditionally, the third quarter is impacted by seasonality associated with lower levels of capital markets related revenues, particularly securities lending and foreign exchange. However, given the ongoing volatility in the markets we may see better than historical trend in some our businesses including foreign exchange.*** Of course, if the current week equity markets hold, it will obviously impact market performance and asset and wealth management. Expense growth is being managed especially carefully. The credit provisions should be stable with Q2, and we are continuing to focus on delivering our synergy targets. We expect the tax rate to be approximately 33%.

***

Gerald I. Hassell, [President and director of BNY]:

> ***Ken, I think a good example on the revenue synergy side would be an area like foreign exchange where the combined book continues to perform very well, and I would suggest we maybe out performing our peers in some of the categories because of the revenue synergy associated with combining the books.*** That's a great example where we are pulling through, they just showing up in existing revenues, how those synergies are coming together. Some of the other revenue synergies are around the asset gathering capabilities, some of which are showing up in Pershing's numbers, some of which are showing up in Asset Management numbers. So we are tracking it, we are on or ahead of schedule of what we updated you on in the investor conference and feel very good about the continued opportunities going forward.

***

Todd Gibbons:

> Yeah, Mark, I'll take it. It's Todd Gibbons. ***Almost all of the head count increases that you are seeing are really related to growth in our Asset Servicing businesses.*** And I'll let Jim and Tim speak to that in a moment. But we are on track to manage to the numbers that we've given to you. So I think any growth that you are seeing is just the growth in the underlying businesses and I don't know Jim or Tim if you want to add something to that?

(Emphasis added).

111.    On September 10, 2008, Defendant B. Kelly gave a presentation at the Lehman Financial Services Conference.  In the presentation, BNY conveyed to investors that client service and satisfaction was a fundamental part of its success and strategy for growth: in a slide labeled "Industry Leading Client Service Globally: Foundation for Revenue Growth" which noted that BNY was the number one ranked asset servicing provider in various customer surveys.[3]

112.    On October 16, 2008, BNY filed a Form 8-K with the SEC containing a press release reporting BNY's third quarter 2008 financial results.  For that quarterly period, BNY reported "**record**" FX trading and "other trading" revenue of $385 million, and highlighted the fact that the number was up 62% year over year.  (Emphasis added).

113.    That same day, on BNY's third quarter 2008 earnings conference call, certain officers and directors of BNY made the following statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]
>
> > …***Our operating performance exceeded expectations. It was driven by*** the diversity of our six security servicing ***and asset management businesses plus*** the impact of market volatility.
> >
> > ***
> >
> > We now have $82 billion in non-interest bearing deposits, up $50 billion this year and clearly that would help NII as well. ***Market volatility resulted in record levels of foreign exchange and trading revenue based upon client volumes and activity.*** Credit quality remains strong, non-performing loans actually declined this quarter.  Our earnings were impacted by capital support agreements, however, it is highly unlikely we will create new ones going forward.

---

[3]     This slide was included in numerous investor presentations by BNY thereafter, including: at the Merrill Lynch 2008 Banking & Financial Services Conference on November 11, 2008; at the Citi Financial Services Conference on January 28, 2009; Barclays Financial Services Conference on May 6, 2009; and Barclays Capital 2009 Global Financial Services Conference on September 16, 2009, among others.

Thomas P. Gibbons:

> *Fee revenue was strong in security servicing and even more so in foreign exchange and other trading*.  Fee revenue was negatively impacted by the decline in equity values principally in our asset and wealth management fees.  Net interest revenue benefitted from a large inflow of non-interest bearing deposits late in the quarter and I think the ability of our security servicing businesses to attract deposits reflects a very positive view of BK during turbulent market periods.

> \*\*\*

> *Fx and other trading revenue generated extremely strong growth of 62% year-over-year and 25% sequentially.*  We benefitted from higher levels of currency volatility and client volumes relative to both periods as well as the higher value of our portfolio credit default swaps which we used to hedge certain loan exposures.

> \*\*\*

> I'm going to conclude my remarks by offering a few observations about the fourth quarter.  *Given the ongoing volatility in the markets, we may continue to see better than historical trend performance in foreign exchange, net interest revenue and securities lending.*  Weak equity markets will continue to impact asset management and performance fees. We will continue to manage expense growth especially carefully.

(Emphasis added).

114.  On January 20, 2009, BNY filed a Form 8-K with the SEC and corresponding press release reporting is financial results for the fourth quarter of 2008.  BNY reported that during that quarter, while numerous large American financial institutions collapsing, BNY had made $782 million in asset servicing fee revenue, comprised in large part of "**record**" FX and "other trading" revenue of $510 million, up 67% year over year.  (Emphasis added).

115.    That same day, BNY conducted a fourth quarter 2009 earnings conference call, during which certain officers and directors made the following statements:

> Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:
>
> > Frankly its pretty good to see 2008 in the rear view mirror now. We generate a profit every quarter including in the fourth quarter. We had record levels of revenue in our institutional servicing businesses in Q4. *We had outstanding results in foreign exchange and net interest income.*
> >
> > *We enjoyed a flight to quality in deposits, wide spreads in net interest income and we enjoyed volatility in the foreign exchange markets which really helped those revenues.*
>
> ***
>
> Todd Gibbons:
>
> > *Volatility was also a key driver for us.  We gauge volatility based on a basket of the 30 major currencies and during the quarter exchange rates were extremely volatile and combined with increased market share we enjoyed a record quarter for our foreign exchange business.*

(Emphasis added).

116.    On February 27, 2009, BNY filed a Form 10-K with the SEC reporting its financial results for the fiscal year 2008.  The Form 10-K reported $1.462 billion in fee revenue from FX trading and "other trading," up 86%, or $540 million, compared to the fiscal year 2007. For the year 2008, FX reported asset servicing revenue of $3.3 billion.

117.    On April 21, 2009, the Company filed a Form 8-K with the SEC containing a press release reporting its first quarter 2009 financial results.  For the quarterly period, BNY reported FX trading and "other trading" revenue of $309 million, and highlighted the fact that this number was up 19% year over year, the financial crisis notwithstanding.

118.     Also on April 21, 2009, BNY held its first quarter 2009 earnings conference call,

during which certain officers and directors made the following statements:

Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:

> *In Q1, interbank lending spreads declined, deposit levels had finally started to moderate and volatility has come down in FX.* The good news is this is, of course, positive for the financial markets overall.  We're starting to see some improvements in the money markets with fixed-income activity in some of the equity markets.

***

> In wealth management, we had our 13th consecutive quarter of net positive claim assets flows.  *In asset servicing, we posted strong new business wins.  Over the past year, we won $1.9 trillion in assets in new assets under custody and that's over $300 billion in the most recent quarter*.

***

**Todd Gibbons:**

> *FX and other trading revenue increased 19% year-over-year*, and it actually declined 40% sequentially.  The increase from the year-over-year quarter reflects the benefit from higher volatility of key currencies, partially offset by lower client volumes.  The decrease from the record fourth quarter reflects the impact of both lower volatility and client volumes.  With approximately 85% of the FX revenue driven by our securities servicing clients, lower volume and values negatively impacted trading revenue.

> *We were pleased once again, however, to be recognized for our quality service in the Global Investor magazine, FX Survey, who rated the number one FX provider, and we won Best FX Service Overall.*

***

> On a possible note [sic], *in asset servicing for the second year in a row, we ranked number one among all Global Custodians in the*

> *R&M Survey, and we now have the number one quality ranking*
> *across all three major custody surveys.*

(Emphasis added).

119.    On July 22, 2009, BNY filed a Form 8-K with the SEC announcing its financial results for the second quarter of 2009 and reporting that FX trading and "other trading" revenue was down 23% to $239 million.  During its second quarter 2009 earnings conference call, BNY confirmed that "FX and other trading revenue decreased 23% both sequentially and year over year."  In explaining the cause of the decrease in FX trading revenue during BNY's second quarter 2009 earnings conference call, BNY claimed, in pertinent part, that "[t]raditionally, third quarter earnings are negatively impacted by seasonality associated with lower levels of capital markets related revenues, particularly securities lending and foreign exchange.  We expect net interest revenue to remain at current low levels because of the global rate environment.  However, we continue to see some positive indicators for our business model."

120.    On October 20, 2009, BNY filed a Form 8-K with the SEC reporting its financial results for the third quarter 2009, reporting FX and "other trading" revenue of $246 million, down 36% year over year.  During its October 20, 2009 third quarter 2009 earnings conference call, Defendant R. Kelly explained the decrease in FX revenue as follows:

> *FX and other trading revenue increased 4% sequentially,*
> *reflecting strength and fixed income derivatives trading and a*
> *smaller loss in credit to both swap hedges, partially offset by*
> *lower foreign exchange revenue driven by lower volatility and*
> *seasonality*.  The year-over-year decrease of 36% reflects lower
> foreign exchange revenues driven by lower volumes and volatility
> as well as a lower evaluation of the credit derivatives portfolio
> used to hedge the loan portfolio.

(Emphasis added).

121.    On January 20, 2010, BNY held its fourth quarter 2009 earnings conference call, during which Defendant R. Kelly made the following statements with respect to BNY's asset management services:

> Several of our core businesses are showing some improvement with a particular strong quarter in asset management.  However, the persistently low interest rate environment around the world continues to challenge our net interest revenue and also impacts fee revenue due to fee waivers that are pretty substantial in our company….
>
> **Fee revenue was actually up 2% versus the prior quarter excluding the net impact of third quarter asset sales.  We had excellent growth in assets in wealth management fees**. They were up 13%.  We had net long-term asset flows of $14 billion which was the biggest increase since 2006 and performance fees were up $58 million.  **Our security servicing fees excluding tech lending revenue was actually up 1% led by core fees in asset servicing as well as in issuer services.**

(Emphasis added).

122.    On April 20, 2010, BNY conducted its first quarter 2010 earnings conference call, during which certain officers and directors of BNY made the following statements:

Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:

> **Service levels remain very strong.  The last annual R&M survey of custody clients and fund managers BNY Mellon Asset Servicing was ranked number one overall in six key categories and ahead of our peer group in a further seven categories.  In Global Investor Magazine's annual FX survey we were ranked number one in 25 categories including four overall performance categories and 14 of the 20 service categories.  This is the third consecutive year in which we have essentially dominated this survey.**

\*\*\*

Todd Gibbons:

> *FX and other trading revenue was up 7% sequentially reflecting higher fixed income trading revenue* and lower mark to market adjustments on credit default swaps that we used to hedge the loan portfolio. The increase was partially offset by lower FX revenue which was down 14% compared to the first quarter of 2009 reflecting lower volatility partially offset by volumes.

> Investment and other income was driven by above trend gains on continuing dispositions of the lease assets and a *positive FX valuation for the quarter.* We would expect lease gains to be lower going forward.

(Emphasis added).

123.     On July 20, 2010, BNY conducted its second quarter 2010 earnings conference call, during which certain officers and directors of BNY made the following statements:

Todd Gibbons:

> Thanks Bob and good morning. As I get into the numbers, my numbers will follow the quarterly earnings review beginning on page 3. Let me isolate a few key data points on a sequential basis. First of all, we earned $0.55 for the quarter on both a reported and operating basis. *Fee revenue benefited from a 6% increase in security servicing fees, and a 39% increase in foreign exchange.*

> ***

> *FX revenue of $244 million was up 39% sequentially, on higher volatility.* The FX in other trading line was down 16% however, due to negative trading revenue of $24 million, which was largely a result of the credit valuation adjustment driven by widening spreads in the quarter, as well as a lower level of fixed income trading.

> ***

Robert P. Kelly, [Chief Executive Officer of BNY and Chairman of the Board from the 2007 Merger to August 31, 2011]:

> Okay. Let me start with the trading revenue. There are really three drivers of what -- I mean, let us start with FX, FX with strong volumes were pretty good. Obviously volatility was up, and we saw the 39% increase. The decline in other trading revenue was a reflection of three things. First of all, it is just lower fixed income

41

across trading, across the board.  Secondly, the credit valuation adjustment in our derivatives portfolio was a negative for the quarter.  We saw our spreads widen.

(Emphasis added).

124.    On April 19, 2011, BNY conducted its first quarter 2011 earnings conference call, during which certain officers and directors of BNY made the following statements:

Alexander Blostein - Goldman Sachs Group Inc.:

Okay, that's helpful.  And then maybe just one more follow-up on FX.  *Is there a way for us to -- for you guys to size for us how much of your FX business comes from really standby -- standing instructions versus negotiated trades, just to get -- to help us kind of size that bucket that -- obviously it's been a lot in the press?*

J. Jeffrey Hopson - Stifel, Nicolaus & Co., Inc.:

Just a question on pricing.  *If there's more, I guess, scrutiny of FX rates, et cetera, it's maybe limited your ability to get full pricing. So in terms of the pricing environment, with rates low, how do we know, I guess, that you're getting the appropriate -- how are you getting the appropriate pricing for the new business that's coming in the door?*

***

Unknown Analyst:

Okay.  *If I could follow up with a question on FX. Historically, that's been one of your highest margin businesses.  With what's going on, should we expect the pretax margin on that business to come down towards sort of the level of the rest of the firm?*

Thomas Gibbons:

Rob [ph], *I would say it's probably early to tell.  Right now, our behaviors and the revenues are consistent with the drivers that we've seen historically.  Given the increased attention, we would expect the competitiveness of FX to -- it's been competitive. It will continue to be competitive.  And there is some potential there for margin compression.  It's unfortunate.  I can't deny that, but I think we are in the process of taking a number of actions to increase, for example, the volumes that is done with us to*

42

*mitigate that.   **Right now, 75% of the transactions, FX** transactions that our clients execute are done away from us. So there's a real opportunity for us to capture more of that business that's done away.   In terms of the operating margin on FX, the actual standing instructions have higher costs associated with them.*   So I don't think the margin implication is going to be that high. Jim, do you have anything to add to that?

James Palermo:

> Yes, I completely agree with you, ***Todd, that likely going forward, the heightened awareness will add to the competitive nature that we're seeing.***   But there's a lot of opportunity there, and in our discussions, as I said, that we had just last week with our clients, they're very supportive of the approach that we've taken.   And they're even more supportive of some of the technology enhancements that we're about to embark upon.   And so our expectation is that we will catch more of that flow.

(Emphasis added).

125.   On July 19, 2011, BNY conducted its third quarter 2010 earnings conference call, during which certain officers and directors of BNY made the following statements:

Todd Gibbons:

> ***Investment management had another strong quarter.*** Higher market values, net new business was partially offset once again by higher money market fee waivers.   ***FX and other trading was up slightly both year-over-year and sequentially.***   FX revenue totaled $184 million, a decrease of 25% year-over-year, reflecting lower volatility, partially offset by higher volumes.   FX revenue was up 6% sequentially, reflecting higher volatility.

***

Thomas Gibbons:

> Yes, we follow very much the FASB guidelines.   It's based on estimable and probable. So if we feel something that we can estimate what a loss is going to be and it's probable, we will reserve for it.

(Emphasis added).

126.    All of the foregoing statements to investors were materially inaccurate, contained material omissions, or were misrepresentations.   Throughout the Class Period, defendants discussed Asset Servicing revenues and FX trading revenues when a significant factor in those revenues was fee income derived from BNY's improper practice of overcharging investors in standing instruction FX transactions.   As a consequence, shares of BNY common stock traded at artificially inflated prices throughout the Class Period.

**The Truth Emerges**

127.    In February 2011, the media reported that BlackRock Inc., the world's largest fund manager, had become concerned that BNY had been overcharging some of its clients in connection with standing instruction FX trades.   BlackRock began an internal investigation and altered the way that it traded currencies in order to avoid the standing instruction fee practices used at BNY.

128.    Also in February 2011, the media reported that the Attorneys General of Virginia and Florida would be suing BNY over its standing instruction fee practices of defrauding investors and pension funds out of foreign exchange fees.

129.    On January 19, 2011, FX Analytics served the Virginia Attorney General with a copy of its First Amended Complaint filed under seal in Virginia Circuit Court on behalf of the Commonwealth of Virginia against BNY.   The document, subsequently unsealed, captioned *Common Wealth of Virginia, ex rel. FX Analytics v. The Bank of New York Mellon*, stated substantially similar allegations to those contained herein and accused BNY of violating Virginia law by knowingly submitting false claims for payment to an employee of the Commonwealth, using of false records to obtain payment from the Commonwealth, and related counts.

130.    On February 3, 2011, the Attorney General of Florida filed a notice intervening in

the FX Analytics case against BNY.  On February 5, 2011, the *Miami Herald* published an article titled "Florida: Did Bank Rob Us?" reporting:

> Attorney General Pam Bondi plans to take over a whistle-blowers' lawsuit alleging that the Bank of New York Mellon defrauded Florida's pension fund with the secret markup on billions of dollars, collecting a higher currency-conversion price than it actually got and pocketing the difference.  The whistle-blowers filed a similar lawsuit in Virginia.

131.    On February 4, 2011, the Attorney General of Virginia solicited requests from law firms seeking to be appointed special counsel to represent the Commonwealth of Virginia in prosecuting the case against BNY.

132.    Meanwhile, in October 2009, whistleblower lawsuits against BNY were filed under seal in New York, Virginia, and Florida by a plaintiff called FX Analytics, a Delaware partnership being used to shield the identities of the whistleblowers.  Although the specific allegations were not public because the cases were filed under seal, at least one of the FX Analytics complaints has since been unsealed.

133.    On April 5, 2010, FX Analytics brought a whistleblower lawsuit against BNY on behalf of 10 pension funds filed under seal in the Superior Court of the State of California for violations of the California State False Claims Act, Cal. Gov. Code § 12651, *et seg.*  The second amended complaint, subsequently unsealed, captioned *In re Bany of New York Mellon Corporation False Claims Act Foreign Exchange Litigation, Ex rel. FX Analytics*, *Common Wealth of Virginia, ex rel. FX Analytics v. The Bank of New York Mellon*, stated substantially similar allegations to those contained herein and accused BNY of violating the California State False Claims Act by assigning fictitious FX rates to pension funds' purchases and sales of foreign securities, making false statements and creating false records related thereto, and conspiring to commit those offenses.  The action alleges that BNY knowingly and intentionally

45

created and carried out a fraudulent scheme in which BNY charged the ten pension funds fictitious FX rates that were not the FX rates at which BNY actually executed requested FX transactions for the funds.  As the lawsuit alleges, this FX trading scheme dates back at least ten years, affects institutional investors nationwide, and currently yields an estimated $500 million annually to BNY.

134.    On August 11, 2011, the State of Florida filed a Complaint in Intervention in Florida Circuit Court in the matter of *State of Florida ex rel. v. The Bank of New York Mellon*, alleging three counts of fraud in connection with substantially similar FX trading practices by BNY.

135.    Also on August 11, 2011, the Commonwealth of Virginia filed a Complaint in Intervention in the FX Analytics case against BNY seeking approximately $931 million and alleging that BNY knowingly deceived its custodial banking clients about its standing instruction practices and that BNY violated the Virginia Fraud Against Taxpayers Act.

136.    On August 31, 2011, amidst the steep decline of BNY's stock price and the multitude of attorneys general and whistleblower suits brought against BNY, BNY announced that Defendant R. Kelly had stepped down as a director and Chief Executive Officer of BNY and as Chairman of the Board.  According to a *Bloomberg.com* news article, Defendant R. Kelley was replaced "after a dispute with directors over the way he ran the company."

137.    On October 4, 2011, the Attorney General of New York filed a complaint in New York State Supreme Court, captioned *State of New York, ex rel. FX Analytics v. The Bank of New York Mellon Corporation*, stating claims on 13 counts related to BNY's standing instruction practices including: securities fraud, affirmative misrepresentations, "persistent fraud or illegality," violations of the New York State False Claims Act, unjust enrichment, common law

fraud, breach of fiduciary duty, and breach of contract.  According to the New York Attorney General, Eric T. Schneiderman, BNY "consistently overcharged customers for processing foreign exchange transactions."  The New York Attorney General's suit seeks recovery about $2 billion, which are the ostensible ill-gotten profits that BNY generated over the last decade through its standing instruction services.

138.    Also on October 4, 2011, the United States Attorney for the Southern District of New York filed a complaint in the United States District Court for the Southern District of New York reportedly seeking hundreds of millions of dollars, captioned *United States of America v. The Bank of New York Mellon Corporation*, stating claims in connection with the standing instruction practices under the Financial Institutions Reform, Recovery, and Enforcement Act for civil penalties and an injunction against BNY's "ongoing fraudulent pricing scheme."

139.    On October 12, 2011, a *Wall Street Journal* article entitled "Secret Informant Surfaces in BNY Currency Probe" reported that Grant Wilson, a former BNY trader located in Pittsburgh, had become a secret whistleblower assisting currency-trading investigations of BNY's standing instruction FX trading services.  Unbeknownst to BNY, Mr. Wilson had been a secret whistleblower for the past two years where he worked on a BNY trading desk, buying and selling currencies for BNY, where he has "extensive personal contact with the employees and executives" behind the alleged scheme.

140.    Mr. Wilson informed law-enforcement officials how the alleged scheme worked at BNY and provided internal documents showing BNY's profits.  According to the *Wall Street Journal* article, "a separate 'transaction desk' was responsible for collecting the currency trades made for the bank's 'standing instruction' clients and then setting the price at which the bank would record those transactions.  The prices often were at or near the day's least favorable

exchange rates, states attorneys general and prosecutors allege, with the bank profiting from the difference."

141.    State attorneys generally allege that "emails and internal communications from [BNY] show executives endorsing the alleged currency-transaction practice, favoring clients with better pricing, and worrying that profit margins would fall if the bank were more transparent."  In fact, BNY is alleged to have "cherry-picked the least-favorable rates for pension funds."

142.    Mr. Wilson's input culminated with the filing of the October 4, 2011 lawsuits against BNY by the Justice Department and New York attorney general.   Using specific information provided by Mr. Wilson, the suits filed against BNY in Virginia and Florida were able to identify "specific amounts of standing-instruction trades – $5.375 billion – that had been processed through a Pittsburgh desk in July 2009."

143.    Moreover, on October 26, 2011, the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts filed an action against BNY for violating the Massachusetts Uniform Securities Act.   According to that action, BNY's scheme to deceive its clients by misleading and omitting critical information with respect to its FX standing instruction service was perpetuated over a minimum of ten years and garnered tens of millions in illegal profits for BNY.

144.    As details publicly emerged about BNY's fraudulent FX trading scheme, BNY's stock price plummeted 62% from a Class Period trading high of $49.40 per share on January 3, 2008 to a closing price of $18.97 per share on October 14, 2011, a price which is significantly less than the price at which the Plan and its participants were acquiring the stock during the Class Period.  In reporting on the August 31, 2011 news that BNY had replaced Defendant R. Kelly as

a director, Chief Executive, and Chairman of the Board, Gerard Cassidy, an analyst as RBC Capital Markets explained that, "[t]he stock price is the ultimate measure of a CEO's job, and the stock hasn't done well."

**Defendants Knew Or Should Have Known That BNY Stock
Was An Imprudent Investment For The Plan**

145.    At all relevant times, defendants knew or should have known that BNY was engaging in the practice of overcharging its clients for processing FX transactions pursuant to standing instructions by failing to give those clients the best available exchange rates, which made BNY common stock an imprudent investment for the Plan.

146.    However, defendants, as fiduciaries of the Plan, failed properly to take into account BNY's improper FX trading practices which put BNY stock at risk when determining the prudence of investing and holding the Plan's assets in the BNY Stock Fund.

147.    As a result of defendants' knowledge and failure to disclose BNY's improper FX trading practices, any generalized warnings of market and diversification risks that defendants made to the Plan's Participants regarding the Plan's investment in BNY stock did not effectively inform Participants of the past, immediate, and future dangers of investing in BNY common stock.

148.    The Administration Committee, responsible for the operation and administration of the Plan and communication with Participants, either failed to uncover, or uncovered but failed to disclose, the true affect of BNY's improper FX trading practices on BNY's current and future financial health.  The Administration Committee failed to provide the Plan's Participants with complete and accurate information so that they could make informed decisions regarding investing in the BNY Stock Fund.

149.    The Investment Committee, responsible for selection and monitoring of the Plan's investments solely in the best interest of the Plan's Participants, failed to consider whether BNY common stock was a prudent investment for the Plan in the first instance and, upon information and belief, failed to monitor the performance of the same, for purposes of recommending a more prudent level of Plan investment in BNY stock or the elimination of BNY stock entirely as a Plan investment.  Indeed, at all relevant times, the Investment Committee failed adequately to consider whether continuing to offer BNY stock as a Plan investment served the best interests of the Plan's Participants.

150.    The Monitoring Committee, responsible for appointing, monitoring, and (if necessary) replacing the members of the Administration and Investment Committees, failed adequately to monitor the Administration Committee's operation and management of the Plan and failed adequately to monitor the Investment Committee's selection and monitoring of the Plan's investments.  Indeed, the Monitoring Committee had the full discretion and authority to remove members of the Administration and Investment Committees and yet, failed to do so when the Monitoring Committee either knew or should have known that BNY was engaging in improper FX trading practices and that the Administration and Investment Committee members were not prudently and loyally managing the Plan and its investments by permitting the Plan to continue investing heavily in BNY stock during the Class Period.

151.    At the same time, BNY, the Administration Committee Defendants, the Investment Committee Defendants, and the Monitoring Committee Defendants failed adequately to review the performance of the other defendants who were fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

152.    An adequate investigation by BNY, the Administration Committee Defendants, the Investment Committee Defendants, and the Monitoring Committee Defendants would have revealed to a reasonable fiduciary that investment by the Plan in BNY stock was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect the Plan's Participants against unnecessary loss, and would have made different investment decisions.  Because defendants knew or should have known that BNY stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan, its participants and beneficiaries from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in BNY common stock.

153.    At the same time, unaware that BNY's statements and representations about BNY's FX trading practices were false and misleading and failed to disclose that BNY has been systematically overcharging FX investors, the Plan's Participants invested substantial amounts of their retirement savings in BNY Stock at prices that were artificially inflated.

154.    When the public began to learn the truth about BNY's overcharging scheme, BNY's stock price plummeted, taking with it Participants' vested retirement benefits in the Plan. Because of defendants' fiduciary breaches, the vested retirement benefits in the Plan have been significantly diminished and impaired.

155.    A prudent fiduciary acting under similar circumstances would have taken reasonable steps to prevent, or at least, minimize the losses sustained by the Plan and to preserve Participant's retirement savings.

156.    In fact, defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of all investments in the BNY Stock Fund; discontinuing all further Participant elective contributions

in the BNY Stock Fund; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by BNY they could not loyally serve the Plan's participants in connection with the Plan's acquisition and holding of BNY stock.

157.    Despite the availability of these and other options, defendants failed to take any action to protect participants from losses as a result of the Plan's investment in BNY stock.  In fact, the defendants continued to invest and allow investment of the Plan's assets in BNY stock even as BNY's improper and unlawful practices came to light.

## CLAIMS FOR RELIEF UNDER ERISA

158.    At all relevant times, Defendants were, and acted as, fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

159.    ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

160.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any diminution of vested benefits to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

161.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to

Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law."  They entail, among other things:

   (a)   The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and

   (b)   A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

162.   ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

   . . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(8), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

163.    Plaintiff thus brings this action under the authority of ERISA § 502 for Plan-wide relief pursuant to ERISA § 409(a) to recover the lost profits and diminution of vested benefits and other losses sustained by the Plan arising out of Defendants' breaches of fiduciary duties.

## COUNT I

**Failure to Manage the Plan's Assets Prudently and Loyally.**
**Breaches of Fiduciary Duties in Violation of ERISA § 404**
**(Against All Defendants)**

164.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

165.    Defendants were responsible for the selection, maintenance, and monitoring of the Plan's investment options, including the option to purchase and hold investments in BNY stock.

166.    Defendants exercised discretionary authority and/or control over management of the Plan's or disposition of the Plan's assets and were, during the Class Period, responsible for ensuring that investment options made available to Participants were prudent.  Defendants were responsible for ensuring that all investments in BNY stock were prudent, and are liable for losses incurred as a result of such investments being imprudent.

167.    Defendants knew or should have known that, throughout the Class Period, BNY was engaging in a scheme to defraud standing instruction investors by giving them unfavorable currency-exchange rates.  Defendants should have further known that BNY's failure to disclose this scheme artificially inflated the value of BNY common stock.

168.    The Plan's fiduciaries should have recognized the imprudence of Participants continuing their investments in BNY stock.  Participants, in contrast, invested in BNY stock relying on BNY's financial misstatements and omissions and the Plan's fiduciaries' continued offering of BNY stock as an investment option under the Plan.  Because defendants never

54

disclosed adverse material information to Participants at the time that Participants made such investments, Participants lacked knowledge of the facts concerning the inaccurate statements and omissions alleged herein which revealed the imprudence of investing in BNY stock.

169.   Defendants breached their duties to prudently and loyally manage the assets of the Plan.   During the Class Period, upon the exercise of reasonable care, defendants should reasonably have known that investment in BNY common stock was imprudent in that any such investment was unsuitable and inappropriate for either Participant contributions or company matching contributions to the Plan.   During the Class Period, defendants, in violation of their fiduciary duties, continued to offer BNY Stock as an investment option for the Plan and to direct and approve the Plan's investment in BNY Stock, instead of other investments as permitted by the Plan.   Thus, Plan Participants materially overpaid for BNY shares acquired during the Class Period.   Despite the imprudence of any investment in BNY during the Class Period, defendants failed to take adequate steps to prevent the Plan, and indirectly the Participants, from suffering substantial losses as a result of the Plan's investment in BNY stock.

170.   Defendants also breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of the Plaintiff and the members of the Class, regardless of defendants' own interests.

171.   Defendants also breached their fiduciary duties by failing to disclose that they had failed prudently and loyally to manage the assets of the Plan in the exercise of their discretion with respect to BNY stock as an investment option in the Plan.

172.   As a direct and proximate result of defendants' breaches of their fiduciary duties owed to the Plaintiff and the Class, the Plan, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants' are liable.

55

## COUNT II

**Failure to Adequately Monitor the Other Fiduciaries of the Plan
and to Provide Them With Accurate Information
Breaches of Fiduciary Duties in Violation of ERISA § 404
(Against BNY and the Monitoring Committee Defendants)**

173.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

174.   By virtue of their fiduciary responsibilities, the defendants named in this Count were bound to monitor the other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plan and its investments.

175.   The Monitoring Committee maintained discretionary authority and control with respect to appointing, monitoring, and when necessary, removing members of the Administration Committee which was responsible for managing and administering the Plan.  Accordingly, the Monitoring Committee Defendants breached their duties to monitor and inform by:

   (a)   Failing to ensure that the Administration Committee, as a monitored fiduciary, had access to knowledge about BNY's practices and procedures for obtaining exchange rates for FX transactions pursuant to standing instructions, as alleged above, which made BNY stock an imprudent retirement investment;

   (b)   Failing to ensure that the Administration Committee appreciated the increased risk posed by the significant investment by rank and file employees in BNY stock;

   (c)   Failing to disclose to the Administration Committee accurate information about the operations and financial results of BNY which Defendants reasonably should have known the Administration Committee needed to make sufficiently informed decisions about construing, interpreting, and administering the Plan;

   (d)   Failing to ensure that the members of the Administration Committee were prudently and loyally managing and administering the Plan; and

(e)     To the extent it was necessary, failing to remove and replace members of the Administration Committee for their failure to prudently and loyally manage and administer the Plan.

176.    The Monitoring Committee maintained discretionary authority and control with respect to appointing, monitoring, and when necessary, removing members of the Investment Committee which was responsible for selecting, managing, and overseeing the Plan's investments.  Accordingly, the Monitoring Committee Defendants breached their duties to monitor and inform by:

(a)     Failing to ensure that the Investment Committee, as a monitored fiduciary, had access to knowledge about BNY's practices and procedures for obtaining exchange rates for FX transactions pursuant to standing instructions, as alleged above, which made BNY stock an imprudent retirement investment;

(b)     Failing to ensure that the Investment Committee appreciated the increased risk posed by the significant investment by rank and file employees in BNY stock;

(c)     Failing to ensure that the Investment Committee possessed accurate information about the operations and financial results of BNY which the Investment Committee needed to make sufficiently informed decisions about what investment options the Plan should continue to offer;

(d)     Failing to ensure that the members of the Investment Committee were prudently and loyally selecting, evaluating, and monitoring the investment options available under the Plan; and

(e)     To the extent it was necessary, failing to remove and replace members of the Investment Committee for their failure to prudently and loyally select, evaluate, and monitor the investment options available under the Plan.

57

177.     As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered damages for which defendants are liable.

## COUNT III

**Failure to Provide Complete and Accurate
Information to the Plan's Participants and Beneficiaries
Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
(Against All Defendants)**

178.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

179.     During the Class Period, defendants' fiduciary duties bound them to ensure that communications by and about the Plan and its assets were truthful, complete, and not misleading, including information concerning the investment options offered under the Plan.

180.     Throughout the Class Period, defendants failed to provide Plan Participants with complete and accurate information regarding BNY's standing instruction FX trading practices necessary for Plan Participants to accurately assess the quality of an investment in BNY stock.

181.     Instead, defendants conveyed false and misleading material information to the investing public and to the Plaintiff and the Class, regarding the soundness of BNY stock and the prudence of investing retirement savings in BNY stock.  Because large percentages of the Plan's assets were invested in BNY stock during the Class Period, losses therefrom materially affected the value of Participants' retirement assets.

182.     Defendants' misrepresentations and omissions were material to the determination of Plaintiff and members of the Class whether investing in or maintaining their investments in the BNY stock was prudent.  As such, Plaintiff and members of the Class are presumed to have relied to their detriment on defendants' misleading statements and omissions.

183.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered damages for which defendants are liable.

### COUNT IV

**Failure to Act Exclusively in the Interests of the Plan's Participants
Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
(<u>Against All Defendants</u>)**

184.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

185.    Defendants were duty bound to act with undivided loyalties to the Plan, binding them to discharge their responsibilities solely in the interest of Participants and for the exclusive purpose of providing benefits thereto.

186.    Defendants breached their duty of loyalty by:

(a)    Failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transaction which made BNY stock an unsuitable investment for the Plan;

(b)    Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(c)    With respect to each of the failures listed in the preceding subparagraphs, Defendants failed adequately to inform Plaintiff and members of the Class to prevent general investors, creditors and others from discovering BNY's scheme to defraud investors by overcharging them in FX transactions; and

(d)    By otherwise placing the interests of BNY and themselves above the interests of the Participants with respect to the Plan's investment in BNY Stock, by among other things, keeping the Plan's assets heavily invested in BNY common stock when it was imprudent to do so - rather than divesting the Plan's investments in BNY common stock - while certain fiduciaries sold their personally held BNY common

stock at artificially inflated prices.  As a result, certain fiduciaries personally profited from those sales while the Plan and its Participants suffered massive losses.

187.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT V

**Co-Fiduciary Liability**
**Breaches of Fiduciary Duties in Violation of ERISA § 405**
**(Against the Administration Committee Defendants, the Investment Committee**
**Defendants, and the Monitoring Committee Defendants)**

188.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

189.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

190.    As alleged herein, BNY, through its officers and employees, such as the Administration Committee Defendants, the Investment Committee Defendants, and the Monitoring Committee Defendants failed to provide material information to the Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices

to the detriment of Plaintiff and members of the Class, and, thus, knowledge of such practices is imputed to these defendants as a matter of law.  In addition, as alleged herein on information and belief, BNY and the other defendants named in this Count participated in and/or knew about BNY's scheme to defraud standing instruction investors.  Thus, these defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of BNY stock as an investment for the Participants' retirement assets.

191.   Despite this knowledge, the defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of BNY stock during the Class Period.  Defendants did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in BNY stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A).  In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in BNY stock despite knowing such failures were breaches of fiduciary duty under ERISA.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

192.   In further violation of ERISA § 405(a)(1)(C), the defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by further concealing BNY's improper and illegal FX trading practices from Participants and the market as a whole.

193.   In addition, the defendants named in this Count enabled the imprudent asset management decisions of any and all other defendants – including any appointed fiduciaries of

61

the Plan – who lacked knowledge of the circumstances rendering BNY stock imprudent, by failing to provide such persons with complete and accurate information regarding BNY stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by BNY's improper practices, so that these other defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in BNY stock.  In so doing, these defendants breached ERISA § 405(a)(1)(B).

194.    Further, through their failure to properly and effectively monitor their appointees on the Administration Committee, the Investment Committee, and Monitoring committee Defendants and remove those fiduciaries whose performance was inadequate as alleged above, the defendants named in this Count enabled these appointed fiduciaries' imprudent management of the Plan's investment in BNY stock.

195.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants, lost a significant portion of their retirement investment and Plan Participants materially overpaid for their BNY shares.

196.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of other members of the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that the Defendants, together and individually, breached their fiduciary

duties under ERISA to Plaintiff and members of the Class;

C.    Declaring that the Defendants, together and individually, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.    Compelling the Defendants to reimburse the Plan for all losses thereto, resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the assets of the Plan, and to restore to the Plan all profits defendants made through the use of the assets of the Plan, and to restore to the Plan all investment profits that Plaintiff and member of the Class would have made if Defendants had fulfilled their fiduciary obligations;

E.    Enjoining Defendants, together and individually, from any further violations of their fiduciary duties under ERISA;

F.    Awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the individual accounts of Plaintiff and members of the Class in proportion to the losses of those accounts;

G.    Awarding Plaintiff and members of the Class damages as a result of the wrongs complained of herein, with pre-judgment and post-judgment interest;

H.    Awarding Plaintiff and members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

I.    Awarding Plaintiff and members of the Class such other and further relief as the Court may deem just and proper.

Dated:  November 4, 2011

**LAW OFFICE OF ALFRED G. YATES JR., PC**

By: <u>s/Alfred G. Yates, Jr.</u>
  Alfred G. Yates, Jr. (PA17419)
  Gerald L. Rutledge (PA62027)
  519 Allegheny Building
  429 Forbes Avenue
  Pittsburgh, PA 15219
  Tel: (412) 391-5164
  Fax: (412) 471-1033
  Email: *yateslaw@aol.com*

  **HARWOOD FEFFER LLP**
  Robert I. Harwood
  James G. Flynn
  Roy Shimon
  488 Madison Ave. 8th Floor
  New York, New York 10022
  Tel: (212) 935-7400
  Fax: (212) 753-3630

  **MILBERG WEISS LLP**
  Lori G. Feldman
  Arvind B. Khurana
  Jennifer J. Sosa
  One Pennsylvania Plaza, 49th Floor
  New York, NY, 10119-0165
  Tel: (212) 594-5300
  Fax: (212) 868-1229

  ***Attorneys For Plaintiff***